WILKINSON, Circuit Judge,
with whom WYNN, Circuit Judge, joins, concurring:
I am happy to concur, in Judge King’s fine opinion in this case.
No one really knows what the right answer is with respect to the regulation of firearms. It may be that relatively unre *150 stricted access to guns will diminish the incidence of crime by providing a deterrent force against it. On the other hand, it may be that such access leads only to a proliferation of incidents in which the most deadly firearms are unleashed against the public.
The question before us, however, is not what the right answer is, but how we may best find' it. The dissent aspires to subject a host of firearm regulations to “strict scrutiny,” a term of art deployed here to empower the judiciary and leave Congress, the Executive, state legislatures, and everyone else on the sidelines. I am unable to draw from the profound ambiguities of the Second Amendment an invitation to courts to preempt this most volatile of political subjects and arrogate to themselves decisions that have been historically assigned to other, more democratic, actors. The fact that Heller exempted from legislative infringement handguns broadly utilized for self-defense in the home does not mean that it disabled legislatures from addressing the wholly separate subject of assault weapons suitable for use by military forces around the globe. See District of Columbia v. Heller, 554 U.S. 570, 626-28, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).
Disenfranchising the American people on this life and death subject would be the gravest and most serious of steps. It is their community, not ours. It is their safety, not ours. It is their lives, not ours. To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design their destiny — this would deliver a body blow to democracy as we have known it since the very founding of this nation.
In urging us to strike this legislation, appellants would impair the ability of government to act prophylactically. More and more under appellants view, preventive statutory action is to be judicially forbidden and we must bide our time until another tragedy is inflicted or irretrievable human damage has once more been done. Leaving the question of assault weapons bans to legislative competence preserves the latitude that representative governments enjoy in responding to changes in facts on the ground. Constitutionalizing this critical issue will place it in a freeze frame which only the Supreme Court itself could alter. The choice is ultimately one of flexibility versus rigidity, and beyond that, of whether conduct that has visited such communal bereavement across America will be left to the communal processes of democracy for resolution.
Providing for the safety of citizens within their borders has long been state government’s most basic task. See, e.g., Boston Beer Co. v. Massachusetts, 97 U.S. 25, 32, 24 L.Ed. 989 (1877). In establishing the “right of law-abiding, responsible citizens to use arms in defense of hearth and home,” Heller did not abrogate that core responsibility. 554 U.S. at 635, 128 S.Ct. 2783. Indeed, Heller stopped far short of the kind of absolute protection of assault weapons that appellants urge on us today. The dissent, by contrast, envisions the Second Amendment almost as an embodiment of unconditional liberty, thereby vaulting it to an unqualified status that the even more emphatic expressions in the First Amendment have not traditionally enjoyed. As Judge King has aptly noted, Heller was a cautiously written opinion, which reserved specific subjects upon which legislatures could still act. See id. at 626, 128 S.Ct. 2783 (recognizing that the Second Amendment right is “not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose”). Had Heller in fact failed to reserve *151 those subjects, or had it been written more ambitiously, it is not clear that it could have garnered the critical five votes.
The weapons that Maryland sought to regulate here are emphatically not defensive in nature. Of course, no. weapon is what we learned long ago in real property class to call a fixture. Weapons may remain at home for a while but their station is not permanent. They can always be taken out on the town. For what purpose? The Maryland legislature could readily conclude that assault weapons, unlike handguns, are efficient instruments of mass carnage, and in fact would serve as weapons of choice for those who in a commando spirit wish to charge into a public venue and open fire. Likewise, the legislature could validly determine that large detachable magazines with a capacity of more than ten rounds of ammunition in fact facilitate assaults by those who seek to eliminate the need to reload.
If this statute is struck down, it is difficult to see what class of non-automatic firearms could ever be regulated. If these weapons are outside the legislative compass, then virtually all weapons will be. It is altogether fair, of course, to argue that the assault weapons here should be less regulated, but that is for the people of Maryland (and the Virginias and the Car-olinas) to decide.
Appellants claim, however, that these assault weapons cannot be banned because they are “in common use” and are “typically possessed by law-abiding citizens for lawful purposes.” Appellants’ Supp. Br. 20-23. This language was of course employed in. Heller, 554 U.S. at 624-28, 128 S.Ct. 2783, but it did not purport to make any inquiry into common usage and typical possession the exclusive province of the courts. The dissent’s forays into the properties and usages of this or that firearm are the kind of empirical inquiries routinely reserved for legislative bodies which possess fact-finding capabilities far superi- or to the scantily supported views now regularly proffered from the bench. In fact, legislators are uniquely suited to discern popular habits and to understand regular usage within the populace. The term “common use” was never meant to deal to courts the sole and supreme hand in a political controversy where the combatants on both sides are robust, where they are energized, and where they are well stocked with arguments they can press before the public.
•As Heller recognized, there is a balance to be struck here. While courts exist "to protect individual rights, we are not the instruments of anyone’s political agenda, we are not empowered to court mass consequences we cannot predict, and we are not impaneled to add indefinitely to the growing list of subjects on which the states of our Union and the citizens of our country no longer have any meaningful say.
With all respect for my good colleagues who see this important matter differently, I would uphold the Maryland law in its entirety.