In the

# United States Court of Appeals

### For the Seventh Circuit

No. 22-3291

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EMANUEL DAMERON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:18-cr-00815-1 — **Virginia M. Kendall**, *Judge.*

ARGUED APRIL 23, 2024 — DECIDED MAY 31, 2024

Before EASTERBROOK, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Charged in federal court with possessing a firearm as a felon, Emanuel Dameron moved to suppress the firearm and other evidence gathered when police officers stopped and frisked him while aboard a public bus in Chicago. The district court denied Dameron's motion, and a jury found him guilty at trial. On appeal Dameron renews his contention that the police's search of him aboard the bus violated the Fourth Amendment and, in particular, the standards

announced in *Terry v. Ohio*, 392 U.S. 1 (1968). We disagree and affirm.

**I**

On July 5, 2018, a Chicago police officer who was viewing a live video feed from a pole camera spotted Dameron milling about near the intersection of 61st Street and South Martin Luther King Jr. Drive. At first Dameron was with a small group while standing in front of a residential building. But then he began walking down the sidewalk, at which point the officer saw an "L-shaped object" that resembled a gun in Dameron's waistband. The officer relayed his observations to a tactical team positioned nearby.

As the tactical team prepared to respond to the location, Dameron boarded a city bus. The responding officers reacted by stopping the bus, boarding, and approaching Dameron. An officer promptly patted down Dameron and recovered a gun from his waistband. Upon being arrested, Dameron stated that he had the gun for protection. In time a federal indictment followed, alleging a violation of 18 U.S.C. § 922(g)(1).

Dameron filed a motion to suppress the gun and his statement to the police, contending that the officers had no more than a hunch—and not the reasonable suspicion required by *Terry*—that he possessed a firearm.

The district court held an evidentiary hearing, received the video footage into evidence, and heard testimony from the officer who operated the pole camera. The officer testified that he was familiar with the neighborhood in which the arrest took place, had monitored it for 18 months, and knew there had been "a lot of gang and narcotic activity as well as

shootings" in this part of the city. The officer added that, on the day of the arrest, he observed an "L-shaped object" tucked in Dameron's waistband underneath his shirt. The officer believed the object was a gun, explaining that on multiple prior occasions he had seen similar objects that turned out to be guns.

An officer from the tactical team also testified. He too explained that the neighborhood was "a well-known documented gang and narcotics location" and the site of "an ongoing rival gang conflict … which results in several people being shot and killed every year." The officer then explained how the tactical team, in response to the observations from the pole camera operator, stopped the bus, frisked Dameron, and recovered the gun.

The district court denied Dameron's motion to suppress, concluding that the combination of the plainly visible L-shaped bulge in Dameron's waistband and his presence in a high-crime area generated reasonable suspicion to justify the *Terry* stop. A jury later found Dameron guilty of possessing a firearm as a felon, and the district court sentenced him to 110 months' imprisonment.

## II

The parties devote much of their briefing to volleying over an argument never presented to the district court. Dameron observes that Illinois permits the concealed carrying of firearms and from there contends that police had no way of knowing from the pole camera footage alone whether he was an authorized license holder—a circumstance that would negate any reasonable suspicion that he unlawfully possessed a firearm. In Dameron's view, then, the appeal requires us to

decide how the Second Amendment (in light of *District of Co-lumbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)) interfaces with the Fourth Amendment (and *Terry*'s reasonable suspicion standard) when it comes to police use of pole camera and like technology to detect criminal activity in public places.

We decline the invitation, as Dameron never presented this argument to the district court. Regardless, the appeal lends itself to resolution on the narrow and straightforward ground that the police's search of Dameron occurred on and after he boarded a public bus. That fact is significant because the Illinois Concealed Carry Act is clear that a license holder "shall not knowingly carry a firearm on or into … [a]ny bus, train, or form of transportation paid for in whole or in part with public funds." 430 ILCS 66/65(a)(8); see also Chi. Trans. Bd., Ill., Ordinance 016-110 (Sept. 14, 2016) (prohibiting gun possession on public transit); 720 ILCS 5/24-1(a)(4) (prohibiting gun possession "in any vehicle" when not in accordance with 430 ILCS 66/1 et seq.).

So, even if the officers were required to suppose that Dameron was the holder of a concealed-carry license—something we do not decide—his boarding the bus changed things. At that point, officers, informed as they were about the pole-camera observations, had reasonable suspicion to believe Dameron had violated the law. And their ensuing pat-down search of Dameron did not violate the Fourth Amendment. See *Terry*, 392 U.S. at 27–28 (explaining that a reasonable belief that a suspect is armed authorizes a limited pat-down search for weapons).

In the final analysis, then, we AFFIRM and leave for another day the sure-to-come challenging questions about how

Second Amendment standards after *Heller* and *Bruen* interact with applications of *Terry* on facts not far from those presented here.