J-A27016-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
YOUSEF PURDIE :
:
Appellant : No. 2651 EDA 2024

Appeal from the Judgment of Sentence Entered August 29, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002343-2023

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.: **FILED DECEMBER 15, 2025**

Yousef Purdie (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of one count of persons not to possess firearms.[1] We affirm.

On March 12, 2023, John Mosley (Mr. Mosley) was sitting in his van in the parking lot of a Philadelphia laundromat, waiting for a car to vacate a parking space near the building. N.T., 3/12/24, at 5-7. When the car left the space, Mr. Mosley moved his van into the space. *Id.* at 8. At the same time, Appellant backed his vehicle toward the same space. *Id.* Appellant exited his vehicle, approached Mr. Mosley, and asked him to move out of the space. *Id.* Mr. Mosley refused. *Id.* Appellant then reached into his coat pocket and

_____

[1] 18 Pa.C.S.A. § 6105(a)(1).

showed Mr. Mosley a green handgun with a black magazine. *Id.* at 8-11. Mr. Mosley became concerned and started his engine, but Appellant said "never mind" and walked away. *Id.* at 8-9. Shortly thereafter, Mr. Mosley called the police. *Id.* at 12. Upon arriving at the laundromat, police questioned Appellant and Katrina Sloan (Ms. Sloan), the mother of Appellant's children, who was a passenger in Appellant's vehicle at the time of the incident. *Id.* at 45-50. Police recovered a green handgun from Ms. Sloan's purse. *Id.* The gun was registered to Ms. Sloan, who had a valid concealed carry permit. *Id.* at 58-59.

Appellant, however, was prohibited from possessing a firearm as a result of a 2011 conviction for possession with intent to deliver a controlled substance (PWID).[2] *Id.* at 55 (parties' trial stipulation that on May 17, 2011, Appellant "was convicted and sentenced for [PWID] as a felony[,] making him ineligible to possess a firearm under [section 6105].")

The Commonwealth subsequently charged Appellant with persons not to possess, as well as the additional charges of carrying a firearm without a license, carrying a firearm on public streets in Philadelphia, possession of an instrument of crime, and simple assault.[3] Before trial, the Commonwealth *nolle prossed* the additional charges. The matter proceeded to a jury trial on

---

[2] 35 P.S. § 780-113(a)(30).

[3] 18 Pa.C.S.A. §§ 6016, 6108, 907, 2701.

the sole charge of persons not to possess. On March 13, 2024, the jury found Appellant guilty. On August 29, 2024, the trial court imposed a sentence of four to eight years' imprisonment.

Appellant filed a timely post-sentence motion, as well as a "Motion to Vacate Conviction and Sentence and Arrest Judgment." In the motion to vacate, Appellant argued section 6105 was unconstitutional, both facially and as applied to Appellant, under the Second and Fourteenth Amendments of the United States Constitution. Motion to Vacate, 9/9/24, ¶ 1. Relying on *New York State Rifle & Pistol Assoc. v. Bruen*, 597 U.S. 1 (2022), Appellant argued section 6105 "cannot survive constitutional scrutiny because [the Commonwealth] cannot sustain its constitutional burden to 'affirmatively prove' that this firearm regulation[,] facially and/or as applied[,] 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Id.* ¶ 5 (quoting *Bruen*, 597 U.S. at 19). Appellant maintained that "a conviction for PWID does not establish that the individual is dangerous. It is a not a crime of violence, nor does it involve the individual threatening violence." *Id.* ¶ 6.

On September 16, 2024, the trial court entered orders denying Appellant's post-sentence motion and motion to vacate. Appellant timely appealed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents a single issue for our review:

> Was [Appellant's] conviction under 18 Pa.C.S.A. § 6105(a)(1) in violation of his Second Amendment right to bear arms, because

- 3 -

the prior conviction that prohibited him from possessing a firearm under the statute, a conviction for [PWID], does not establish that he presents a threat to the physical safety of others, and therefore § 6105, as applied to [Appellant], is not consistent with this Nation's historical tradition of firearm regulation?

Appellant's Brief at 1.[4]

The constitutionality of a statute "is a question of law for which our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Farmer**, 329 A.3d 449, 451 (Pa. Super. 2024), **appeal granted**, 343 A.3d 180 (Pa. 2025) (citation omitted). "In an as[-]applied challenge, the court determines whether a law with some permissible applications is unconstitutional as applied to Appellant's actions in this case." **Id.** (citation omitted). "[T]he laws of our General Assembly are presumed to be constitutional, and … one who challenges a law's constitutionality bears a heavy burden to demonstrate that the law 'clearly, palpably, and plainly violates the constitution.'" **Id.** at 455 n.5 (quoting **Commonwealth v. Eid**, 249 A.3d 1030, 1041 (Pa. 2021)).

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. In **D.C. v. Heller**, 554 U.S. 570 (2008), the United States Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons"

_____

[4] We observe that, on appeal, Appellant advances only an as-applied challenge, and not a facial challenge.

- 4 -

for self-defense, unconnected to militia service. *Id.* at 592. The *Heller* Court struck down a District of Columbia law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Id.* at 628. Significantly, *Heller* recognized that

> **the right secured by the Second Amendment is not unlimited.** From Blackstone[5] through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. … Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, **nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons** and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27 (emphasis and footnote added).

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment right to keep and bear arms applies to the states by operation of the Fourteenth Amendment. *Id.* at 750; *see also id.* at 787 (plurality) ("repeat[ing]" *Heller*'s "assurances" that its holding does "not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill[.]'" (quoting *Heller*, 554 U.S. at 626)).

_____

[5] W. Blackstone, Commentaries on the Laws of England (1765).

In **Bruen**, the Supreme Court struck down New York State's public-carry licensing regime, under which New York "issue[d] public-carry licenses only when an applicant demonstrate[d] a special need for self-defense." **Bruen**, 597 U.S. at 11. The **Bruen** Court held, "consistent with **Heller** and **McDonald**, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." **Id.** at 10.

**Bruen** recognized that **Heller** employed a "methodology centered on constitutional text and history," and rejected the application of "any means-end test such as strict or intermediate scrutiny." **Id.** at 22. The **Bruen** Court

> reiterate[d] that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

**Id.** at 24 (citation omitted). As the **Bruen** Court further explained, this test

> requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on

constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 26-27.

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." **Drummond v. Robinson**, 9 F.4th 217, 226 ([3d Cir.] 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 30 (italics in original).

The **Bruen** Court determined the petitioners, "two ordinary, law-abiding citizens," were "part of 'the people' whom the Second Amendment protects." *Id.* at 31-32. The Court further determined "[t]he Second Amendment's plain text … presumptively guarantee[d the] petitioners … a right to 'bear' arms in public for self-defense." *Id.* at 33. Finally, after analyzing "the Anglo-American history of public carry," the Court

> conclude[d] that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. **Heller**, 554 U.S. at 581…. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for

personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public.

*Id.* at 70.

In **U.S. v. Rahimi**, 602 U.S. 680 (2024), the Supreme Court rejected a Second Amendment challenge to "a federal statute which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." **Id.** at 684-85 (quoting 18 U.S.C. § 922(g)(8)). Applying the test articulated in **Bruen**, the **Rahimi** Court concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." **Id.** at 702.

Turning to the statute at issue here, section 6105(a)(1) defines the offense of persons not to possess as follows:

A person who has been convicted of an offense enumerated in subsection (b), within or without this Commonwealth, regardless of the length of sentence or whose conduct meets the criteria in subsection (c) shall not possess, use, control, sell, transfer or manufacture or obtain a license to possess, use, control, sell, transfer or manufacture a firearm in this Commonwealth.

18 Pa.C.S.A. § 6105(a)(1).[6]

_____

[6] Subsection (c)(2) extends the firearm prohibition to "[a] person who has been convicted of an offense under the … Controlled Substance, Drug, Device
*(Footnote Continued Next Page)*

In **_Commonwealth v. Jenkins_**, 328 A.3d 1076 (Pa. Super. 2024), **_appeal granted_**, 343 A.3d 181 (Pa. 2025), this Court upheld the constitutionality of section 6105 as applied to a challenger whose prohibition resulted from his being a fugitive from justice. **_See_** 18 Pa.C.S.A. § 6105(c)(1) (extending firearm prohibition to "[a] person who is a fugitive from justice."). After conducting a historical analysis pursuant to **_Bruen_** and **_Rahimi_**, we concluded that, "[t]aken together, [historical] surety laws and laws disarming vagrants and outlaws offer ample support that the disarmament of [Jenkins], a fugitive from justice, is consistent with the Second Amendment." **_Jenkins_**, 328 A.3d at 1092.

In **_Farmer_**, this Court upheld the constitutionality of section 6105 as applied to a challenger whose prohibition resulted from a robbery conviction. **_See_** 18 Pa.C.S.A. § 6105(b)(1) (identifying robbery among the enumerated offenses resulting in firearm prohibition). The **_Farmer_** Court set forth the following analysis:

> The Supreme Court's **_Rahimi_** opinion, particularly its "how" and "why" analysis with regard to "going armed" laws, provides an avenue for upholding felon firearms bans such as that of § 6105, at least temporarily.[7] The common law "going armed" laws prohibited the use of dangerous weapons to terrify people and imposed forfeiture of weaponry as a punishment. **_Rahimi_**, 602

---

and Cosmetic Act … that may be punishable by a term of imprisonment exceeding two years." 18 Pa.C.S.A. § 6105(c)(2). It is undisputed that Appellant's 2011 PWID conviction meets subsection (c)(2)'s criteria.

[7] The **_Farmer_** Court noted "that under 18 Pa.C.S.A. [§] 6105(c), a person may make application to a court for relief from the disability imposed under § 6105." **_Farmer_**, 329 A.3d at 458 n.12.

U.S. at 697, 144 S. Ct. 1889.  Plainly, the experience of being robbed at gunpoint and/or the threat of being robbed at gunpoint by one convicted of having done so in the past is sufficient to cause terror.  And [18 Pa.C.S.A.] § 6105 is strikingly similar to [18 U.S.C.A.] § 922(g)(8), at issue in *Rahimi*, in both how—prohibition of firearm possession—and why—[Farmer], based on his criminal history, poses a threat of violence—it restricts [Farmer's] Second Amendment right.  And this case, as distinct from both *Rahimi* and *Range* [*v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (*Range I*), *cert. granted, judgment vacated sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024)[8]], involves a criminal conviction for a felony that involved the use of a firearm.  Given the United States Supreme Court's treatment of the "going armed" laws in its *Rahimi* opinion, we can safely conclude that our nation does indeed have a history and tradition of disarming people like [Farmer].

*Farmer*, 329 A.3d at 458 (original footnotes omitted; footnotes added).

Instantly, Appellant argues that

the Commonwealth cannot demonstrate that § 6105's ban on the possession of firearms by all persons convicted of PWID "is consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17.  The mere fact of [Appellant]'s thirteen-year-old conviction for PWID, a nonviolent crime for which he completed his sentence years ago, does not indicate that he poses a threat to the physical safety of others.

---

[8] Range's firearm prohibition under 18 U.S.C.A. § 922(g)(1) stemmed from a Pennsylvania misdemeanor conviction for making a false statement to obtain food stamps.  *Range I*, 69 F.4th at 98 (citing 62 P.S. § 481(a)).  Range sought a declaration that section 922(g)(1) violated the Second Amendment as applied to him.  *Id.* at 99.  In *Range I*, the Third Circuit held that section 922(g)(1) was unconstitutional as applied to Range.  *Id.* at 106.  The Supreme Court subsequently vacated *Range I* and remanded for further consideration in light of *Rahimi*.  *See Range*, 144 S. Ct. 2706.  On remand, the Third Circuit again deemed section 922(g)(1) unconstitutional as applied to Range, concluding "the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms…."  *Range v. Attorney General*, 124 F.4th 218, 232 (3d Cir. 2024) (*Range II*).

Indeed, there is no historical tradition of disarming people solely because they were convicted of a nonviolent crime like PWID.

Appellant's Brief at 8 (citation modified). Appellant maintains **Rahimi**, **Jenkins**, and **Farmer** are distinguishable, as Farmer was convicted of a violent crime involving use of a firearm, **id.** at 24-25, and Rahimi and Jenkins were prohibited from possessing firearms "only after an individualized determination of [their] dangerousness." **Id.** at 26. Appellant asserts that PWID is not a violent crime. **Id.** at 27. He further asserts he was never "subject to any individualized 'threat' assessment and determined to be actively dangerous," nor was he ever "accused or convicted of committing any violent acts or even possessing a firearm during the commission of his PWID offense." **Id.**

Appellant argues the Commonwealth cannot "point to a historical tradition of disarming people convicted of similar nonviolent crimes." **Id.** at 35. Appellant maintains that "no founding-era laws specifically provided for disarming individuals who had been convicted of felonies…." **Id.** at 45. Appellant asserts historical "surety" laws, "going armed" laws, and laws disarming groups perceived to pose a threat of armed rebellion are not analogous to section 6105's firearm prohibition against those convicted of PWID. **Id.** at 39-43, 46-48.

Appellant filed his brief on April 11, 2025. Significantly, on July 31, 2025, this Court decided **Commonwealth v. Randolph**, 343 A.3d 1248 (Pa. Super. 2025), in which we upheld the constitutionality of section 6105 as

applied to Randolph, whose firearm prohibition stemmed from a seventeen-year-old PWID conviction. ***Randolph***, 343 A.3d at 1250.

On August 11, 2025, the Commonwealth filed its brief in the instant case, arguing that "[t]he facts of ***Randolph*** are materially indistinguishable from those here and its holding is controlling." Commonwealth Brief at 9. The Commonwealth argues that Randolph

> had been convicted of PWID seventeen years before being found in possession of a handgun. [***Randolph***, 343 A.3d at 1250]. Like [Appellant] here, [Randolph] was convicted of violating § 6105 and raised an as-applied challenge to the statute under ***Bruen*** and ***Rahimi***. ***Id.*** at [1251]. Also like [Appellant] here, Randolph argued that the lack of "violence" inherent in a PWID offense indicates that banning PWID offenders from possessing firearms is inconsistent with the nation's historic tradition of owning firearms. ***Id.*** at [1256-57].

Commonwealth Brief at 9. The Commonwealth further argues that,

> if anything, the facts here indicate that [Appellant] poses a greater risk of potential harm to others than the defendant in ***Randolph***. Whereas Randolph's PWID convictions were seventeen years old, [Appellant's] PWID conviction here was more recent[,] at only twelve years old. And while Randolph was simply "observed in possession of a handgun at a bar," [***Randolph***, 343 A.3d at 1250], [Appellant] displayed his handgun to a fellow driver in a threatening manner in order to intimidate the driver into giving up a parking space.

Commonwealth Brief at 11.

We note that Appellant filed no reply brief, and did not otherwise seek leave for additional briefing to address ***Randolph***. We agree with the

Commonwealth that **Randolph** is materially indistinguishable and therefore controls the outcome of the instant case.[9]

Appellant's arguments are foreclosed by **Randolph**'s reasoning, which included the following cogent analysis:

> Based upon our review of the jurisprudence, including the Supreme Court's most recent discussion in **Rahimi**, we conclude that the prohibition imposed on [Randolph] by § 6105 "is consistent with the Nation's historical tradition of firearm regulation." **Bruen**, 597 U.S. at 24, 142 S. Ct. 2111. As noted, the **Rahimi** Court stated that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." **Rahimi**, 602 U.S. at 702, 144 S. Ct. 1889. Here, the trial court specifically found that [Randolph's] prior convictions for PWID placed him in the category of persons who would pose a credible threat to others. This was supported by the Commonwealth's argument at the hearing [on Randolph's motion to dismiss his persons not to possess charge]. **See** N.T. Hearing, 8/8/23, at 16 ("[D]rug trafficking is inherently a violent offense. It indicates a willingness on the part of the drug trafficker to defend his business by any means necessary, and most drug dealers do possess firearms.").

_____

[9] Regarding the first part of the **Bruen** analysis, the Commonwealth does not contest that Appellant is among "the people" protected by the Second Amendment's plain text. **See** Commonwealth Brief at 8; **see also** Appellant's Brief at 15-21 (arguing Appellant is among "the people"). **Randolph** followed **Farmer**'s holding that, "in the context of an as-applied challenge to § 6105, 'the people' encompasses all Americans, even criminals." **Randolph**, 343 A.3d at 1256 (citing **Farmer**, 329 A.3d at 455). **But see id.** (noting the "apparent contradiction between **Farmer**" and **Commonwealth v. McIntyre**, 333 A.3d 417 (Pa. Super. 2025) (holding that violent felons like McIntyre are not among "the people" protected by the Second Amendment), and concluding "we must follow **Farmer**'s conclusion as to the first step of **Bruen**, as it was decided earlier in time and because the **McIntyre** panel was unable to overrule that portion of the decision."). As the Commonwealth concedes that Appellant satisfies the first part of the **Bruen** analysis, we address only the second part.

- 13 -

Our position is consistent with the U.S. Supreme Court's repeated admonition that **Heller** and its progeny "should [not] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" **Heller**, 554 U.S. at 626, 128 S. Ct. 2783. Moreover, as numerous courts have recounted in their opinions, categories of people have historically been disarmed despite not having actually engaged in violent behavior. **See**, **e.g.**, [**U.S. v.**] **Jackson**, 110 F.4th [1120,] 1126-27 [(8th Cir. 2024)] (discussing colonial regulations that prohibited certain classes of persons from owning firearms, such as those who fail to swear a loyalty oath); **see also Jenkins**, 328 A.3d at 1092 (highlighting firearms prohibitions relating to sureties and vagrants).

Furthermore, as we astutely observed in **Farmer**:

From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others. The **Rahimi** Court cited surety laws, whereby a person suspected of future misbehavior, including misuse of firearms, was required to post a bond or face jailtime. Those who posted bonds would forfeit the bond in the event of future misbehavior. "Going armed" laws "prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify the good people of the land." Punishment included imprisonment and forfeiture of weaponry.

Noteworthy here is the lesson the **Rahimi** Court drew from the surety and going armed laws. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." That is, [18 U.S.C.] § 922(g)(8) was sufficiently analogous to the going armed and surety laws in both its "how" – restricting gun possession – and its "why" – because the subject posed a credible threat of violence to another.

**Farmer**, 329 A.3d at 454 (cleaned up).

Hence, America's history of prohibiting certain classes of people from having firearms, particularly those that could pose a higher risk of danger to society, provides a "historical analogue"

- 14 -

required by **Bruen** for § 6105, even if it is not a "historical twin." **See Bruen**, 597 U.S. at 30, 142 S. Ct. 2111. Additionally, our holding aligns with the federal court cases cited by [the Pennsylvania Office of the Attorney General's *amicus curiae* brief] that have addressed this nearly identical issue and concluded that the dangerous combination of drugs and firearms permits the government's regulation. **See** *Amicus* brief at 25-28 (citing, by way of example, **Jackson**, **United States v. Birry**, 2024 WL 3540989 (M.D. Pa. 2024), and **United States v. Daniels**, 2024 WL 4906482 (E.D. Pa. 2024)).

In reaching this decision, we necessarily conclude that [Randolph's] arguments to the contrary are unpersuasive. Although he devotes a significant portion of his brief to describing that PWID is not a "crime of violence," that contention is unavailing since "crime of violence" is not the term utilized by the U.S. Supreme Court throughout its recent case law. Instead, the **Rahimi** Court highlighted that firearm prohibitions may apply to those that pose a "credible threat" to the safety of another. Drug traffickers fit that mold.

Next, although [Randolph] is correct that there is no identical provision from the founding era restricting drug traffickers from having firearms, likely arising from the lack of existence of this crime in that era, that does not entitle him to relief. It is clear that "historical analogues" are close enough to show that § 6105 has a historically rooted "how" and "why" of restricting firearm possession. No "dead ringer" is required. **See Bruen**, 597 U.S. at 26, 142 S. Ct. 2111.

**Randolph**, 343 A.3d at 1258-59.

As a convicted drug trafficker whose situation is materially indistinguishable from Randolph's, Appellant similarly fits the mold of persons that pose "a higher risk of danger to society" and a "credible threat" to the safety of others. **Id.** at 1259. For the same reasons set forth in **Randolph**, section 6105's firearm prohibition is constitutional as applied to Appellant. Accordingly, his sole issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/15/2025